## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION AT COLUMBUS

| | | |
|---|---|---|
| **NANCY L. RAIMEY,** | : | **CASE NO: 2:16-cv-403** |
| **Administratrix of the estate of Tamara** | : | |
| **Buford** | : | |
| **c/o Gerhardstein & Branch Co. LPA** | : | **JUDGE: JAMES L. GRAHAM** |
| **432 Walnut Street, Suite 400** | : | **MAGISTRATE JUDGE KEMP** |
| **Cincinnati, Ohio 45202,** | : | |
| | : | |
| **Plaintiff,** | : | **FIRST AMENDED COMPLAINT AND** |
| | : | **JURY DEMAND** |
| **v.** | : | |
| | : | |
| **ROSE EDWARDS** | : | |
| **[ADDRESS REDACTED]** | : | |
| | : | |
| **And** | : | |
| | : | |
| **HARLIS J. THOMPSON, JR.** | : | |
| **C/O Ohio Reformatory for Women** | : | |
| **1479 Collins Ave.** | : | |
| **Marysville, Ohio 43040,** | : | |
| | : | |
| **And** | : | |
| | : | |
| **SUSEELA NALLURI, M.D.** | : | |
| **C/O Ohio Reformatory for Women** | : | |
| **1479 Collins Ave.** | : | |
| **Marysville, Ohio 43040** | : | |
| | : | |
| **And** | : | |
| | : | |
| **ALICE LEE CHAMBLY** | : | |
| **C/O Ohio Department of Youth Services** | : | |
| **640 Island Drive, P.O. Box 598** | : | |
| **Circleville, Ohio 43113** | : | |
| | : | |
| **And** | : | |
| | : | |
| **TARA NICKLE** | : | |
| **C/O Ohio Reformatory for Women** | : | |
| **1479 Collins Ave.** | : | |
| **Marysville, Ohio 43040** | : | |
| | : | |
| **And** | : | |

1

:

**SARAH VOISARD**                    :
**C/O Ohio Reformatory for Women**   :
**1479 Collins Ave.**                :
**Marysville, Ohio 43040**           :
                                     :
**And**                              :
                                     :
**KELLY STORM**                      :
**C/O Ohio Reformatory for Women**   :
**1479 Collins Ave.**                :
**Marysville, Ohio 43040**           :
                                     :
**And**                              :
                                     :
**BETHANY RITTER**                   :
**C/O Ohio Reformatory for Women**   :
**1479 Collins Ave.**                :
**Marysville, Ohio 43040**           :
                                     :
**And**                              :
                                     :
**RONETTE BURKES**                   :
**C/O Ohio Reformatory for Women**   :
**1479 Collins Ave.**                :
**Marysville, Ohio 43040**           :
                                     :
**And**                              :
                                     :
**MATTIE WAKEFIELD**                 :
**C/O Ohio Reformatory for Women**   :
**1479 Collins Ave.**                :
**Marysville, Ohio 43040**           :
                                     :
**And**                              :
                                     :
**JOHN HOLLAND**                     :
**C/O Ohio Reformatory for Women**   :
**1479 Collins Ave.**                :
**Marysville, Ohio 43040**           :
                                     :
**And**                              :
                                     :
**SERGEANT SCOTT DYE**               :
**C/O Ohio Reformatory for Women**   :
**1479 Collins Ave.**                :
**Marysville, Ohio 43040**           :
                                     :

2

And                                        :
                                           :
**JOHN/JANE DOE 1-5**                       :
**C/O Ohio Reformatory for Women**          :
**1479 Collins Ave.**                       :
**Marysville, Ohio 43040**                  :
                                           :
And                                        :
                                           :
**JOHN/JANE DOE 6-10**                      :
**C/O Ohio Reformatory for Women**          :
**1479 Collins Ave.**                       :
**Marysville, Ohio 43040**                  :
                                           :
                                           :
                                           :
         **Defendants.**                    :
                                           :
                                           :
                                           :
                                           :
                                           :
                                           :
                                           :
                                           :
                                           :

## I. PRELIMINARY STATEMENT

1.      This civil rights case challenges the Defendants' failure to treat Ms. Buford's

mental illnesses including her suicidal tendencies.  After three prior failed suicide attempts, Ms.

Buford committed suicide by hanging herself with a garbage bag in the shower at the Ohio

Reformatory for Women ("ORW")  on November 6, 2014.  The Defendant medical providers

who treated Ms. Buford knew she had a long history of serious mental illnesses including three

prior suicide attempts in the six weeks prior to her suicide.  They knew she attempted suicide by

using a garbage bag to hang herself in the shower yet they did not treat her suicidal tendencies.

Defendants Thompson and Edwards knew that Ms. Buford was at risk of suicide as she displayed

warning signs of suicide, including history of suicidal attempts, terminal illness, and had cleaned

her cell. They had knowledge of her mental illnesses, including suicidal tendencies, but did not

3

check on her every 30 minutes as required, did not lock the shower doors, handed her the means to kill herself (a garbage bag), and, during the 90 minutes they knew Ms. Buford was missing, chose not to search for her or alert a supervisor to her being missing.  The Defendant members of Ms. Buford's Treatment Team, a multi-disciplinary team composed of mental health staff, unit staff custody and security staff, were responsible for the treatment and protection of Ms. Buford, a patient with known mental illnesses.  Defendant Buford Treatment Team members were all aware of Ms. Buford's prior suicide attempts, the means by which she had attempted suicide, and did not communicate to all the RTU custody and security and unit staff Ms. Buford's mental health needs and treatment plan and/or did not make themselves aware of all pertinent information in devising a plan to treat Ms. Buford's illness amounting to a denial of medical care. Defendants Kelly Storm, Bethany Ritter, and Ronette Burkes were all aware of Ms. Buford's prior suicide attempts and the lapses in security and training that created the environment allowing Ms. Buford to attempt suicide, and these Defendants did not provide training, and/or enact policies and procedures to ensure that Ms. Buford did not harm herself. Each Defendant's denial of medical care and protection to Ms. Buford resulted in a violation of her right to mental health care and treatment.  Plaintiff, Ms. Buford's mother Nancy Raimey, brings this case for damages for the cruel and unusual treatment Defendants inflicted on her daughter and to ensure that no more women take their own lives at ORW.

## II. JURISDICTION

2.     Jurisdiction over claims arising from Defendants' violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983, is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 (3) and (4).

3.     Venue is proper in this division

## III. PARTIES

4

4.      Plaintiff Nancy L. Raimey is the mother of Tamara Buford and the duly appointed Administratrix of her estate.  She brings this action on behalf of the next of kin as the Administratrix of the estate of Tamara Buford.

5.      Defendant Rose Edwards was at all times relevant to this action a corrections officer at the Ohio Reformatory for Women and an employee of the Ohio Department of Rehabilitation and Corrections.  Defendant Edwards is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  She is sued in her individual capacity.

6.      Defendant Harlis Thompson was at all times relevant to this action a corrections officer at the Ohio Reformatory for Women and an employee of the Ohio Department of Rehabilitation and Corrections.  Defendant Thompson is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued in his individual capacity.

7.      Defendant Suseela Nalluri, M.D. was at all times relevant to this action a psychiatrist and member of Ms. Buford's RTU Treatment Team at the Ohio Reformatory for Women and an employee of the Ohio Department of Rehabilitation and Corrections.  Defendant Nalluri is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  She is sued in her individual capacity.

8.      Defendant Alice Lee Chambly was at all times relevant to this action a psychologist and member of Ms. Buford's RTU Treatment Team at the Ohio Reformatory for Women and an employee of the Ohio Department of Rehabilitation and Corrections.  Defendant Chambly is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  She is sued in her individual capacity.

9.      Defendant Tara Nickle was at all times relevant to this action a social worker and member of Ms. Buford's RTU Treatment Team at the Ohio Reformatory for Women and an employee of the Ohio Department of Rehabilitation and Corrections.  Defendant Nickle is a

5

"person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. She is sued in her individual capacity.

10. Defendant Sarah Voisard was at all times relevant to this action a nurse at the Ohio Reformatory for Women and an employee of the Ohio Department of Rehabilitation and Corrections. Defendant Voisard is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. She is sued in her individual capacity.

11. Defendant Kelly Storm was at all times relevant to this action a Mental Health Administrator at the Ohio Reformatory for Women and an employee of the Ohio Department of Rehabilitation and Corrections. Defendant Storm is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. She is sued in her individual capacity.

12. Defendant Bethany Ritter was at all times relevant to this action a Mental Health Manager at the Ohio Reformatory for Women and a member of Ms. Buford's RTU Treatment Team at the Ohio Reformatory for Women and an employee of the Ohio Department of Rehabilitation and Corrections. Defendant Ritter is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. She is sued in her individual capacity.

13. Defendant Ronette Burkes was at all times relevant to this action the Warden at the Ohio Reformatory for Women and an employee of the Ohio Department of Rehabilitation and Corrections. Defendant Burkes is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. She is sued in her individual capacity.

14. Defendant Mattie Wakefield was at all times relevant to this action an Activity Therapist and member of Ms. Buford's RTU Treatment Team at the Ohio Reformatory for Women and an employee of the Ohio Department of Rehabilitation and Corrections. Defendant Wakefield is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. She is sued in her individual capacity.

6

15.    Defendant John Holland was at all times relevant to this action a RTU Unit Manager and a member of Ms. Buford's RTU Treatment Team at the Ohio Reformatory for Women and an employee of the Ohio Department of Rehabilitation and Corrections.  Defendant Holland is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued in his individual capacity.

16.    Defendant Sergeant Scott Dye was at all times relevant to this action a member of Ms. Buford's RTU Treatment Team at the Ohio Reformatory for Women and an employee of the Ohio Department of Rehabilitation and Corrections.  Defendant Dye is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued in his individual capacity.

17. Defendants John/Jane Doe 1-5, were at all times relevant to this action custody and security staff assigned to the RTU and members of Ms. Buford's RTU Treatment Team at the Ohio Reformatory for Women and employees of the Ohio Department of Rehabilitation and Corrections.  Defendants RTU Treatment Team Custody and Security Staff 1-5 are "persons" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  They are sued in their individual capacity.

18. Defendants John/Jane Doe 6-10 were at all times relevant to this action Unit Management assigned to the RTU and members of Ms. Buford's RTU Treatment Team at the Ohio Reformatory for Women and employees of the Ohio Department of Rehabilitation and Corrections.  Defendants RTU Treatment Team Unit Management 1-5 are "persons" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  They are sued in their individual capacity.

## IV. FACTS

7

### A. **Tamara Buford's History**

19.     Tamara Buford was Nancy Raimey's only birth child among her 8 step and foster children.  Ms. Raimey loved Tamara and took great pride in her daughter's early successes in life.

20.     In her youth, Tamara won the citywide spelling bee. She graduated from high school with honors.  She was a soccer player, a musician, and an artist.

21.     Tamara came from a family of artists.  Her grandfather's art hung in the Smithsonian.  Her father was a talented artist, and Tamara went off to college to hone her own artistic skills.

22.     While pursuing a bachelor's degree, many unforeseen and undeserved challenges disrupted Tamara's life.  At college, Tamara was sexually assaulted, after which Tamara began experiencing psychosis and mania.  She was diagnosed with Schizoaffective Disorder Bipolar Type, and entered the revolving door of psychiatric hospitalizations. Tamara struggled with addiction, was arrested, and served time in prison.

23.     Ms. Raimey loved her daughter and stood by her through it all, offering her a home and support upon each of her releases from prison.

24.     Whenever Tamara was incarcerated, Ms. Raimey was saddened, but also felt a sense of relief; at least she would be safe in prison.

### A. **The Residential Treatment Unit at the Ohio Reformatory for Women**

25.     At the time of her death, Tamara Buford was incarcerated at the Ohio Reformatory for Women.  She was housed in the Residential Treatment Unit ("RTU") ARN3, a unit to which she was always assigned when she was incarcerated at ORW.

26.     The RTU is a housing unit for inmates with mental illness who do not need inpatient treatment, but require a therapeutic housing setting that can provide the full range of

services and variable security levels.  The RTU is designed to provide intensive mental health care for inmates that can be provided in a general population environment. The RTU is a secure, treatment environment that has a structured clinical program.

27.     All custody and security staff assigned to the RTU are required to attend a two day specialized mental health training within three months of being assigned to the RTU.

28.     The RTU has four levels of care. Level 1 is for inmates who are in crisis.  Level 2 is a less protective level that begins to focus on resolution of the crisis.  Levels 3 and 4 provide lesser protection to the inmates and allow inmates more time out of the cell, more activity time, and more freedom to move about the facility.

29.     RTU inmates like Ms. Buford are supervised by the RTU Treatment Team ("treatment team").  The treatment team is a multi-disciplinary team, which consists of custody staff, psychiatry, psychology, social work, nursing, unit management, and activity therapy that collaborate to coordinate all programming, procedures, and treatment for ARN3 patients.

30.     Among the treatment team's responsibility includes assigning a level of protection to the patients housed in the RTU.  The levels start at 1 (most protection) to 4 (least protection). The treatment team's assignment of a level of protection to an inmate can restrict an inmate's access to various types of property, such as coffee and trash bags; and restrict her movements, such as taking showers only at specific times.

31.     RTU Level movement (increase or decrease) is a decision of the treatment team not a sole mental health staff member.

32.     Treatment team members who interact with inmates outside of Treatment Team meetings place their meeting notes in the inmates Interdisciplinary Progress Notes, which all Treatment Team members had knowledge. Ms. Buford's Interdisciplinary Notes were available to her Treatment Team prior to making any medical decisions on her behalf. The Treatment

Team members also had knowledge and access to the contents of her conversations with Treatment Team members outside of her Treatment Team meetings, suicide watch notes, and other prison staff notes that were documented in her Interdisciplinary Notes.

33.     Level 1 inmates are only permitted to have shower shoes, gowns, undergarments, and socks in their cells. They may possess items as directed by the Mental Health Treatment Team.

34.     Level 2 inmates' property may be restricted based on the clinical condition per the Treatment Team.

35.     Correction officers in the RTU are required to do security rounds at staggered intervals not to exceed 30 minutes.  During those rounds, officers are required to do a visual inspection of all offenders within the area to assure that they are individually safe and secure. When an officer cannot locate an inmate within 10 minutes a shift supervisor must be located.

36.     During rounds, officers are required to check blind spots and isolated areas such as shower rooms.  Officers must ensure that inmates are in the showers only during their designated times.  When the showers are not in use they are required to be locked and inmates are not permitted to enter them; this rule is to protect the RTU inmates.

37.     The exact time of all rounds are to be logged by the officer who conducted them.

38.     In November 2014, the RTU Post Operating Schedule required Level 2 inmates, including Ms. Buford, to be locked down in their cells at 5:30 p.m.  The evening medication in the RTU was required to be distributed to patients at 6:30 p.m.  Showers were to be taken between 5:45 a.m. and 6:30 a.m. (during third shift).

39.     RTU Post Orders provide a list of thirteen suicide warning signs that staff are to watch for and refer any inmate at risk for suicide to mental health services.

40.     All RTU corrections officers and staff know that the RTU post orders, post

10

operating schedule, policies, operating procedures, and Level designations are designed to keep inmates safe who may pose a risk of harm to themselves.  All RTU corrections officers and staff know and are trained that they must follow the RTU post orders, post operating schedule, policies and procedures for Level 2 RTU inmates in order to protect them from harm due to their mental health needs, including protecting inmates from suicide.

### B.  Ms. Buford's Suicide Attempts

41.     Suicides and suicide attempts are serious events at ORW.  In 2014, there were two suicides and six suicide attempts, including Ms. Buford. ORW staff are required to thoroughly review each incident to try and prevent it in the future.

42.     Ms. Buford was admitted to the RTU in August of 2013. She reported to Defendant Tara Nickle during her mental health biopsychosocial assessment that she had twice attempted suicide.

43.     Ms. Buford suffered from auditory hallucinations that instructed her to kill herself. On October 29, 2013, RTU nursing staff placed Ms. Buford on suicide watch due to the auditory hallucinations telling her to go on suicide watch.

44.     As early as December 9, 2013, Ms. Buford reported to a RTU nurse that ghosts were telling her to kill herself and that she did not deserve to live. Ms. Buford detailed her suicide plan to the RTU nursing staff, which was to get to the shower room to hang herself. The nurse noted in Ms. Buford's mental health notes that Ms. Buford was suicidal with a plan to hang self in the shower room.

45.     On February 24, 2014, Ms. Buford reported to Tara Nickle that she was hearing voices telling her to harm herself.

46.     On March 23, 2014, RTU Nurse Dean placed Ms. Buford on suicide watch after revealing she wanted to die and asking RTU nursing staff to just allow her to end it all.

47.     On June 16, 2014, RTU staff placed Ms. Buford on suicide watch after having what was documented as acute agitation with psychosis. Ms. Buford was slamming her room door and yelling that she was "sick of the voices".

48.     On June 17, 2014, Ms. Buford shared with her Activity Therapist, Defendant Wakefield that "dying is the only way she can improve". Defendant Alice Lee Chambly noted Ms. Buford's statement in her clinical contact psychology interdisciplinary progress notes.

49.     On July 23, 2014, Ms. Buford reported to RTU nursing staff that she was ready to die and did not want to prolong life. She reported seeing green lights. She was not placed on watch and her level of protection was not modified.

50.     On August 7, 2014, Ms. Buford reported to her treatment team during her treatment team meeting the need for her to be able to cope with the "green lights" she was seeing and the voices she was hearing.

51.     On August 21, 2014, Ms. Buford reported to her treatment team during her treatment team meeting that she was still seeing the green lights which she believes may be the devil.

52.     On August 28, 2014, RTU nursing staff placed Ms. Buford on suicide watch after she told RTU nursing staff that she was suicidal. During this incident she removed a chair from the shower area. She was diagnosed to be suffering from a heightened psychotic episode with paranoia.

53.     On September 3, 2014, when discussing her August 28, 2014 suicide watch, Ms. Buford reported to Defendant Nickle that her outburst with the chair and subsequent suicide statement stemmed from multiple triggers, including her seeing the "green lights" and not feeling safe. She also reported still suffering from the auditory hallucinations.

54.     On October 2, 2014, Ms. Buford reported to her Treatment Team that ghosts were

outside of her room clapping the night before and deceased individuals talking to her.

55.     On October 9, 2014, Ms. Buford reported to Defendant Tara Nickle that the auditory hallucinations were calling her names and telling her to hang herself with socks found in trash can earlier today. She also reported to Defendant Nickle that she had taken a trash bag to the shower the night before and attempted to hang herself by jumping off the shower chair twice but eventually stopped because it hurt too bad. She also reported an attempt a few weeks prior with a laundry bag string. She reported the voices told her she would be dying within two weeks.

56.     Defendant Nickle verified with a second shift security officer that Ms. Buford had entered the shower the evening of October 8, 2014 outside of her permissible hours to access the showers.

57.     After speaking to Defendant Nickle, Ms. Buford recounted the same suicide attempt to both Dr. Tinch and Dr. Nalluri, that the day before she tried to hang herself in the shower room with a plastic garbage bag.  After repeated attempts, she said she stopped because it hurt too bad.  Ms. Buford reported again seeing the green lights, as well as red lights.

58.     After speaking to Ms. Buford on October 9, 2014, Dr. Nalluri started Ms. Buford on a medication called Effexor. A side effect of the medication Effexor is completed suicide, this means that a patient taking Effexor is at risk of completing a suicide attempt.

59.     On October 10, 2014, Ms. Buford reported to Psychologist Christy Tinch that she saw the green and red lights when she closed her eyes.

60.     Ms. Buford's menstrual cycle started two days prior, on October 7, 2014, and she reported to Psychologist Christy Tinch that she always had hallucinations during her cycle.  As a result of Ms. Buford's report, Defendant Dr. Nalluri put her on constant suicide watch for 48 hours.

61.     The allegations in paragraphs 42-60 were documented in Ms. Buford's medical

13

file and known to her treatment team, Defendant Ronette Burkes, and Kelly Storm. Defendant

members of Ms. Buford's treatment team,  the treatment team custody and security staff knew

that there was a strong likelihood that Ms. Buford would commit suicide; that she had attempted

to hang herself with a garbage bag in the showers; and that her risk was so high she needed to be

placed on constant suicide watch to protect her from committing suicide.

62.     On October 11, 2014, Ms. Buford's treatment team moved her from suicide watch

to Level 1 watch.  That same day she reported still seeing the colored lights.

63.     On October 15, 2014, Ms. Buford reported to Defendant Nickle that she was still

experiencing auditory hallucinations and seeing colored lights. The next day, on October 16,

2014, Ms. Buford's treatment team lessened her protections and moved her to Level 2.

64.     After only a few hours on Level 2, Ms. Buford expressed to RTU nursing staff a

desire to go back to Level 1 to protect herself, reporting that while interacting with other inmates

she felt retarded and couldn't talk.  She was encouraged by a RTU nurse to experience Level 2

with confidence.  Ms. Buford did not want to be moved to Level 2 because she did not want to

take a shower between 5:45 am and 6:30 am.

65.     On October 20, 2014, Ms. Buford threw a trash can in the dayroom in hopes of

being put into segregation, which would provide her more restrictions.  Ms. Buford reported to

Defendant Bethany Ritter that the auditory hallucinations were driving her crazy. Defendant

Bethany Ritter, notified the treatment team to consider increasing Ms. Buford's protection by

changing her back to Level 1.

66.     On October 21, 2014, Ms. Buford met with Dr. Nalluri, the psychiatrist on her

treatment team.  Ms. Buford reported to Dr. Nalluri she was hearing voices from the walls of her

room and could not take anymore. Dr. Nalluri kept her at Level 2.

67.     On October 24, 2014, Ms. Buford stated to a unit nurse, Nurse Lane, that, "I

14

should be a Level 1." The treatment team did not change her level or increase her protections.

68.     On October 27, 2014, Ms. Buford found a bottle of Tylenol in the dayroom and swallowed its contents. The pills were brought into the RTU by an inmate who security staff failed to search. Ms. Buford reported to staff she took approximately 100 pills because "the devil wanted her to die". She reported colored lights were disturbing her and that the voices were telling her that it is "judgment day". She had ingested a toxic level of acetaminophen. Ms. Buford was placed on watch in ORW's infirmary at approximately 2:10 p.m. Despite knowledge of her taking a potentially lethal does of Tylenol, she was not sent to the hospital until over three hours later. Due to the hours long delay in seeking medical treatment for her overdose, when Ms. Buford arrived at the hospital she was in a full code status. Ms. Buford received treatment at the hospital and survived the overdose. She was released back to ORW two days later on October 29, 2014. When she returned to ORW, Ms. Buford was housed in the infirmary and placed on suicide watch.

69.     On October 30, 2014, Ms. Buford's RTU treatment team changed Ms. Buford's status from suicide watch to Level 1 and moved her to the RTU despite her reporting that she still hears voices that tell her to harm herself. She reported Satan's voice told her to hang herself. The infirmary doctor noted in Ms. Buford's Interdisciplinary Progress Notes that Ms. Buford "even thought of a plan to get herself sent to ARN 4 on seg and strangulate herself with trash bag hung on window bars". The doctor noted Ms. Buford was very depressed and that she was still seeing the red and green lights.

70.     When being assessed on November 1, 2014, Ms. Buford was hesitant to respond to the assessment stating "I don't want to get in trouble if I talk".

71.     On November 3, 2014, Ms. Buford refused to attend her group therapy activity.

72.     On November 4, 2014, Ms. Buford was transported to the Union County Court of

Common Pleas where she pleaded guilty to assault charges.  She was sentenced and learned that her imprisonment at ORW would be extended.

73.     On November 5, 2014, Ms. Buford reported to an RTU nurse that all of her aches and pain just make her more depressed. Ms. Buford also refused to attend her group therapy activity.

74.     Ms. Buford's treatment team met on November 6, 2014, at approximately 4:00 p.m.  They knew Ms. Buford suffered from severe and persistent mental illnesses including Schizoaffective Disorder Bipolar Type, which caused auditory command hallucinations, suicidal tendencies, and Antisocial Personality Disorder. The treatment team knew she had three suicide attempts in the prior 6 weeks, each suicide attempt made when her level of protections were decreased to a Level 2.  The treatment team knew that Ms. Buford would report that she was not suicidal but that the voices were commanding her to commit suicide. The treatment team knew that Ms. Buford was medication compliant, she was still suffering from the auditory suicide command hallucinations and flashing lights. The treatment team still reduced Ms. Buford's level of protection knowing that the medication she was taking had not controlled the auditory suicide command hallucinations; therefore there was a strong likelihood that she would commit suicide.

75.     The treatment team  knew Ms. Buford had expressed a plan only a week before her completed suicide to get herself transferred so that she could hang herself with a trash bag; they knew she had expressed on several occasions that she was going to hang herself in the shower and had at least on two prior occasions attempted to carry out the plan to hang herself in the RTU shower, one of those attempts with a garbage bag; they knew on at least one prior occasion that she entered the shower area after reporting that she was suicidal and coming out of the shower with a plastic chair; they knew when she returned from the hospital she was eager to take a shower; they knew she experienced hallucinations when she was menstruating and they

16

knew the timing of her cycle; they knew she was upset by her recently extended sentence; they knew her risk factors included having poor judgment, poor coping skills, they knew she had recurring and persistent auditory hallucinations as a result of her mental illness that commanded her to die and/or kill herself, extreme history of psychiatric hospitalizations and watch statuses; they knew she had poor impulse control;  and yet they decreased her protections and moved her to  Level 2.

76.     Ms. Buford's treatment team knew that as a Level 2 inmate, they could restrict Ms. Buford's property based on her clinical condition. They knew her clinical condition involved suicidal ideologies with showers and garbage bags yet the Treatment Team did not ensure RTU corrections staff restricted her access to garbage bags.  The treatment team had the means to communicate with custody and security staff and restrict items RTU inmates were permitted to possess. Ms. Buford was on a caffeine restriction which the treatment team communicated to the corrections staff, who were enforcing that particular restriction on the date of her death.

77.     An RTU inmate on Level 2 is to be closely watched by the RTU corrections officers.

**B.  Ms. Buford's Suicide**

78.     On the evening of November 6, 2014, Defendants Correction Officers Rose Edwards and Harlis Thompson were working in the RTU.

79.     Defendant Edwards had training and was aware of the signs of potential suicide as she had worked for the prison as both a suicide watch officer and a crisis negotiator.

80.     Defendant Thompson had training and was aware of the signs of potential suicide as he had worked for the prison as a RTU suicide watch officer.

81.     At no time did Defendants contact their supervisors for assistance or clarification in doing their duties.

82.     All corrections officers and RTU staff, including Defendants Edwards and Thompson started each shift, including November 6, 2014, by receiving a briefing from the prior shift; reviewing all post orders; reading the log book for the prior 72 hours, and reviewing the suicide log book.

83.     RTU Correction Officers, including Defendants Edwards and Thompson , knew from the communications to officers via email updates that summarized relevant concerns of RTU patients and were recorded in the suicide log book available to officers that Ms. Buford suffered from a serious mental illness; that she was at risk of suicide; that on the day of her suicide she had cleaned her cell and stacked her things very neatly on the bed and floor, which is one of the suicide warning signs detailed in the ARN 3 RTU Post Orders; that she had accessed the showers outside of her designated shower time on at least one prior occasion to attempt suicide;  that she had attempted to hang herself in the RTU shower before with a garbage bag; and that her suicidal ideations involved the shower.

84.     The suicide warning signs that Ms. Buford exhibited from the ARN 3 RTU Post Orders included (1) depression, (2) history of suicidal attempts, (3) terminal illness, (4) further legal problems (her prison sentence had just been extended two days earlier due to an assault on an officer), (5) stopped attending groups and medical appointments, and (6) packing belongings and cleaning cell.

85.     Defendants Edwards and Thompson knew that inmates are only allowed garbage bags if they are on work details and that Ms. Buford, who was just switched to a watch level 2 that day and not on a work detail, should not have had a garbage bag.

86.     After dinner, Ms. Buford asked Defendant Edwards for a garbage bag; Edwards handed her an empty garbage bag. Edwards saw Ms. Buford take the trash bag to the downstairs shower.  Edwards did not follow up with Ms. Buford to see how a severely mentally ill Level 2

18

inmate, who should not be on a work detail was using the plastic garbage bag she was given.

87.    Defendants Edwards and Thompson knew that Ms. Buford was to be locked in her cell at 5:30 p.m., yet they did not lock her in her cell.

88.    At approximately 6:14 p.m., Ms. Buford was still not locked in her cell, and she entered the unlocked, unoccupied downstairs showers with the garbage bag.   Approximately fourteen minutes later Defendant Thompson made his security rounds where he learned Ms. Buford was missing.  He did not search for her, alert his supervisor she was missing, or complete his rounds by searching the showers.  Had he done any one of these things Ms. Buford would have been found and her suffering from attempting suicide would have ended.

89.    Officer Thompson conducted rounds that evening at approximately 6:28 p.m. and again at approximately 7:17 p.m., 7:27 p.m., and 7:35 p.m.  He could not find Ms. Buford during any of those rounds.  He never checked on her.  He did not search for her each time he realized she was missing.  He did not notify his shift supervisor that she was missing.  He did not check the showers during those rounds.  And Officer Thompson did not log any of these rounds.

90.    Officer Edwards documented some of Officer Thompson's rounds and forged some rounds that never happened.

91.    Approximately 45 minutes after Ms. Buford entered the shower with the garbage bag, at approximately 6:59 p.m., Officer Edwards and Nurse Voisard arrived at Ms. Buford's cell for pill call.  Ms. Buford was missing. Nurse Voisard and Officer Edwards left without administering her medication, and without taking any action to locate her.  Officer Edwards did not notify her shift supervisor that Ms. Buford was missing. Had Defendants searched for Ms. Buford or notify a supervisor that she was missing, Ms. Buford would have been found and her suffering from attempting suicide would have ended.

92.    At approximately 7:18 p.m. Officer Thompson walked past Ms. Buford's cell and

19

glanced inside. She was still missing, yet he continued his rounds without hesitating or searching for her or alerting his supervisor.

93.     At approximately 7:38 p.m., Officer Thompson again arrived at Ms. Buford's cell. He opened the door and quickly closed it. She was still missing.

94.     At approximately 7:44 p.m., Officer Thompson again arrived at Ms. Buford's cell, opened the door, looked inside, and closed the cell.  She was still missing. He then had a discussion with Officer Edwards. Afterwards they spoke to the nurses and began searching the unit for Ms. Buford.

95.     Around that time an inmate informed Officer Edwards that she saw Ms. Buford go into the showers.  Officer Edwards opened the door to the showers at approximately 7:50 p.m., leaned in briefly, called out for Ms. Buford, and then left the area.  She did not enter the showers to look in each stall for Ms. Buford.

96.     At approximately 7:54 p.m., Officer Edwards returned to the showers, entered, and found Ms. Buford hanging in the last stall.

97.     Ms. Buford had a trash bag around her neck that was attached to a shower vent. She was on her knees with her arms at her side.  A portable chair that inmates used in the shower was also in the stall with her.

98.     Officer Edwards cut Ms. Buford down. She was still alive.  Her body was warm and she still looked her normal color.

99.     Officer Edwards began CPR. Officer Thompson called for help. EMS was summoned.

100.     Ms. Buford began vomiting as she was given emergency medical assistance.

101.     She was transported to a hospital, where she was pronounced dead at 8:34 p.m.

## C. Defendants' Deliberate Indifference to Ms. Buford's Serious Mental Health Needs

20

102. Defendants had multiple opportunities to provide Ms. Buford mental health care for her mental illness which resulted in known suicidal tendencies, instead, they disregarded the risk of harm of her attempting suicide.

103. Defendant treatment team members, Suseela Nalluri, M.D., Alice Lee Chambly, Tara Nickle, Mattie Wakefield, Sergeant Scott Dye, and John Holland,, John/Jane Does treatment team custody and security staff, and John/Jane Does treatment team unit management staff disregarded the risk of harm when it recklessly changed her level from 1 to 2, knowing that although she was medication compliant, the medication had not stopped Ms. Buford's known auditory hallucinations commanding her to commit suicide; Dr. Nalluri knew that the recent addition of one medication increased the risk she would complete a suicide attempt; they knew she had three prior suicide attempts when her protections were lessened to level 2, knowing her menstrual cycle had started and that she experienced worsening auditory hallucinations to kill herself during her menstrual cycle; did not direct security staff to restrict Ms. Buford's access to trash bags; did not direct corrections staff to limit and supervise Ms. Buford's access to the showers and portable shower chairs; did not alert unit and security staff of the risk of harm to Ms. Buford's having access to trash bags in the shower; did not issue special instructions to corrections or unit staff to lock Ms. Buford in her cell or keep her from entering the shower during undesignated times; did not ensure random security checks were made on Ms. Buford; did not ensure post orders, RTU post schedule, policies, and the treatment plan for Ms. Buford were followed; and willfully and recklessly ignored Ms. Buford's multiple assertions that she needed to be a Level 1 to protect herself.

104. Defendants Edwards and Thompson disregarded the risk of harm to Ms. Buford when they recklessly disregarded her known suicidal tendencies; they did not make security rounds to check on her; did not log security rounds; forged security round logs; did not lock Ms.

21

Buford in her cell at 5:30 p.m.; did not search for Ms. Buford when she was missing; did not alert a supervisor of her disappearance; gave Ms. Buford access to trash bags and the showers and a shower chair; did not check the showers or keep them locked; recklessly disregarded Ms. Buford's suicide warning signs; recklessly disregarded post operating orders, schedules, and procedures specifically designed for the safety of inmates likely to harm themselves, like Ms. Buford; and did not follow RTU/ARN3 policies, procedures, or post orders designed to keep suicidal and mentally ill inmates safe.

105.    Defendant Sarah Voisard had access to Ms. Buford's mental health records; had observed her on at least one occasion while she was on suicide watch; knew from visiting Ms. Buford's cell during medication pass that she had cleaned her cell, which is one of the warning signs of potential for suicide; knew Ms. Buford was terminally ill, which is another warning sign of potential for suicide; knew from Ms. Buford's Medication Administration Record that she was medication compliant and missing medical appointments is a potential for suicide warning sign; knew there was a strong likelihood that she would commit suicide; and recklessly disregarded the risk of harm to Ms. Buford by not attempting to locate her after she realized Ms. Buford was missing from her cell during medication pass, not notifying anyone that Ms. Buford was missing, and completing the Medication Administration Record to reflect that Ms. Buford refused medication as opposed to her being a No Show or another indication that she was missing so that someone reviewing the Medication Administration Record could try to locate Ms. Buford.

106.    Defendants Kelly Storm, Bethany Ritter, Sergeant Scott Dye, and Ronette Burkes had access to Ms. Buford's mental health records; knew of her recent prior suicide attempts at ORW; knew that although she was medication compliant, she still suffered from auditory hallucinations that commanded her to commit suicide, and recklessly disregarded the risk of harm to Ms. Buford by not conducting reviews with officers regarding searching patient property

and approved items permitted in the RTU; by not ensuring clear orders existed for the protection
of the mentally ill inmates with suicidal tendencies housed in the RTU, like Ms. Buford; did not
ensure that RTU officers were properly trained; did not ensure that the RTU treatment team was
properly communicating pertinent information to protect the health and safety of Ms. Buford to
RTU treatment team members not present at her team meetings or to RTU custody and security
staff; and did not ensure that her level of protection was sufficient to protect her from the known
risk  of self-harm.

107.    Defendants Kelly Storm, Ritter, and and Ronette Burkes as part of their job
responsibilities, had a duty to ensure the inmates in the RTU were safe and that the RTU inmates
received proper medical care.  They specifically knew of Ms. Buford's serious medical needs
and mental health condition that resulted in suicidal tendencies and the risk of harm to her if her
medical needs were not met.  Defendants Storm and Burkes recklessly ignored obvious lapses in
training and unsafe conditions that existed in the RTU, which violated Buford's constitutional
rights and increased risk of serious harm. Specifically, Defendant Storm and Burkes knew that
RTU staff were not following the RTU post orders and procedures; that Ms. Buford had
previously used as a means to attempt suicide contraband that RTU staff had allowed into the
RTU; that Ms. Buford although assigned protection Level 2 went unsupervised by RTU staff
long enough to search the garbage for contraband and ingest approximately 100 pills; and that
the mental health and nursing staff in the RTU intentionally denied Ms. Buford access to
emergency medical treatment for several hours after she overdosed on Tylenol.  After Ms.
Buford's suicide attempt with Tylenol, Defendants Storm and Burkes recklessly disregarded
their duty to timely and properly train RTU staff regarding proper searches of RTU patients and
items that were approved for patient possession in the RTU. Defendants Storm and Burkes
recklessly did not review or respond to Ms. Buford's medical needs that were brought to their

attention while she was in their care and custody. The failure of Defendants Storm and Burkes to do their job directly resulted in a violation of Ms. Buford's Eighth Amendment rights.

108.    All Defendants' actions and inactions were unreasonable, intentional, reckless, grossly negligent and taken with deliberate indifference to the federally protected rights of Ms. Buford.  All Defendants had knowledge that Ms. Buford was at serious risk of self-harm due to her mental health condition that caused suicidal tendencies, but chose to disregard those risks.

109.    As a direct and proximate result of Defendants' deliberate indifference and reckless disregard of the foreseeable serious risk that Ms. Buford would attempt suicide, Ms. Buford suffered excruciating physical pain and severe mental anguish for one hour and forty minutes prior to her death.

### D.  <u>Harm to Ms. Buford</u>

110.    The Franklin County Coroner conducted an autopsy on Ms. Buford.  The Coroner determined that Ms. Buford died from ligature strangulation secondary to hanging.  Her injuries were noted as ligature furrow – a groove in her neck caused by the plastic bag – and a fracture of the hyoid bone – a U-shaped bone in the neck that supports the tongue.

111.    Ms. Buford's death was not caused by the bone fracture, it was caused by strangulation.

112.    Strangulation is a painful and slow way to die.  Ms. Buford reported to her RTU treatment team social worker, Ms. Nickle, and her psychiatrist, Dr. Nalluri, that she stopped a prior suicide attempt with a plastic trash bag on October 8, 2014, because "it hurt too bad." After fashioning her ligature (the plastic bag) and then placing herself in a position to be suffocated (jumping from the chair), she felt the pain of being unable to breath for a period of time before losing consciousness.  Then she slowly died from suffocation.  The ORW records show she entered the shower with the trash bag at 6:14 p.m. but was not found for one hour and

forty minutes. When she was found she was still alive.

113. Given the emotional trauma Ms. Buford experienced in the hours planning and thinking about hanging herself, the hour and forty minutes Ms. Buford spent in the shower attempting to hang herself, and the painful manner of death, Ms. Buford suffered emotionally and physically for over an hour and forty minutes.

## V. CAUSE OF ACTION –
## CIVIL RIGHTS ACT – 42 U.S.C § 1983

114. Defendants have, under color of state law, deprived Tamara Buford of rights, privileges, and immunities secured by the Fourteenth Amendment and Eighth Amendment to the U.S. Constitution including, but not limited to, the right to due process, the right to be free from cruel and unusual punishment, the right to medical care, and the right to be protected.

## IX. JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues triable by a jury.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands that this Court:

A.   Award Plaintiff compensatory damages in an amount to be shown at trial;

B.   Award Plaintiff punitive damages in an amount to be shown at trial;

C.   Award Plaintiff reasonable attorney's fees, costs and disbursements;

D.   Award Plaintiff pre and post judgment interest;

E.   Grant Plaintiff such additional relief as the Court deems just and proper.

Respectfully submitted,

/s/ Janaya Trotter Bratton
Jennifer L. Branch (0038893)
Trial Attorney for Plaintiff
Alphonse A. Gerhardstein (0032053)
Adam A. Gerhardstein (0091738)

Janaya Trotter Bratton (0084123)
Attorneys for Plaintiff
GERHARDSTEIN & BRANCH, CO. LPA
441 Vine Street, Suite 3400
Cincinnati, Ohio 45202
(513) 621-9100
(513) 345-5543 (Fax)
jbranch@gbfirm.com
agerhardstein@gbfirm.com
adamgerhardstein@gbfirm.com
jtbratton@gbfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2016 a copy of the foregoing pleading was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Janaya Trotter Bratton
Attorney for Plaintiff